IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED

MAR 1 2 2020

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| LAUREN ASHLEY SMITH,<br><br>Plaintiff,<br><br>vs.<br><br>CHASE JOSEPH RIPLEY, STATE OF MONTANA by and through the CHILD AND FAMILY SERVICES DIVISION OF THE MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES, John Does 1-5, and Jane Does 6-10,<br><br>Defendants. | CV 19–173–DLC<br><br>ORDER |

## INTRODUCTION

Plaintiff Lauren Ashley Smith ("Smith") sued Defendant Chase Joseph Ripley ("Ripley") and the State of Montana by and through the Child and Family Services Division of the Montana Department of Public Health and Human Services ("the State") based on illegal acts Ripley perpetrated against her while he was on the clock as the State's employee. (*Id.* at 1.) The State now moves the Court to dismiss all claims against it that rely on vicarious liability. (Doc. 4 at 1.) For the following reasons, the Court denies the State's motion.

-1-

## BACKGROUND

The State provides protective services to children and families in crisis. (Doc. 3 at 2–3.) In this capacity, and for reasons irrelevant here, the State engaged with Smith's family in May 2017—a relationship that led Smith to stipulate to the State's temporary legal custody of her children, presumably pursuant to Montana Code Annotated § 41–3–442. (*Id.* at 4–5.) Accordingly, the State removed Smith's children from her home and limited her contact with them to supervised visits. (*Id.* at 5.)

On July 10, 2017, the State hired Ripley as a Child Protection Specialist, and at the beginning of September 2017, it assigned him to Smith's case. (*Id.*) In that position, Ripley controlled Smith's contact with her children. (*Id.*) Less than a month after he was assigned to her case, Ripley raped[1] Smith while he was at her home to collect case-related paperwork. (*Id.* at 6.)

Smith filed her Complaint against Ripley and the State in the Twentieth Judicial District Court, Lake County, Montana on August 22, 2019. (*Id.* at 1.) She seeks relief on six grounds. In Count I, Smith asserts a claim against Ripley under 42 U.S.C. § 1983 for his alleged Fourteenth Amendment violations. (*Id.* at 9.)

---

[1] The Court uses the term "rape" colloquially here as a means of describing the collective acts alleged in the Complaint. (Doc. 3 at 7–8.) Ripley was charged with Sexual Intercourse Without Consent, Mont. Code. Ann. § 45–5–503. (*Id.* at 9.) In the end, he pleaded guilty to Official Misconduct, Mont. Code Ann. § 45–7–401(1)(c), and Negligent Endangerment, Mont. Code Ann. § 45–5–208. (*Id.*)

Count II purports violations of the Montana Constitution against Ripley and the State. (*Id.* at 10–11.) There, Smith bases her theory against the State on vicarious liability. (*Id.* at 11.) In Count III, Smith alleges negligence against the State and Ripley, and grounds her theory against the State on both direct negligence—hiring, retention, supervision, and training—and vicarious liability for Ripley's negligent conduct. (*Id.* at 11–12.) She asserts battery against both defendants, with the State vicariously responsible for Ripley's acts, in Count IV. (*Id.* at 12–13.) Likewise, in Count V, Smith alleges negligent infliction of emotional distress, with her theory against the State resting on vicarious liability. (*Id.* at 13.) Finally, in Count VI, Smith asserts a claim for punitive damages against Ripley. (*Id.* at 13–14.)

On October 23, 2019, and with Ripley's consent to do so, the State used the § 1983 allegation to invoke federal jurisdiction and removed the case to this Court. (Doc. 1 at 2–3 (citing 28 U.S.C. §§ 1441 and 1446).) The State now moves to dismiss the vicarious liability-based claims against it. (Doc. 4.) As such, it seeks dismissal of Counts II, IV, and V in their entirety, and Count III to the extent that it relies on a vicarious liability theory.

# DISCUSSION

## I. Jurisdiction

Smith's § 1983 claim invokes the Court's independent subject matter jurisdiction, because it arises under the laws of the United States and therefore presents a federal question. 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367(a), the Court exercises supplemental jurisdiction over the remaining state law claims, because they "are so related to [the § 1983 claim] that they form part of the same case or controversy under Article III of the United States Constitution."

## II. Legal Standard

Presented with a motion to dismiss for failure to state a claim, a court asks "not whether [the plaintiff] will ultimately prevail . . . but whether [her] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (internal citations and quotation marks omitted). The complaint need not be "a model of the careful drafter's art" nor must it "pin plaintiff's claim for relief to a precise legal theory." *Id.* at 530. Instead, it will survive a Rule 12(b)(6) motion if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While the reviewing court must construe all allegations of material fact in the light most favorable to the nonmoving party, *Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019), this deference does not extend to "allegations that are conclusory," *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653 (9th Cir. 2019) (citation omitted). Accordingly, "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory," dismissal is proper. *Id.* (citation omitted).

Faithful to the precepts of *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), the Court looks to Montana law to determine whether Smith pleads cognizable vicarious liability claims against the State. *Felder v. Casey*, 487 U.S. 131, 151 (1988).

## III. Vicarious Liability

"Vicarious liability is not based upon the defendant's own fault. Rather, it is based upon the principle that he must bear legal responsibility for another's wrong." Dan B. Dobbs et al., *Dobbs' Law of Torts* § 425 (2d ed.). Here, Smith advances two vicarious liability theories to impute fault to the State for Ripley's alleged wrongs.[2] First, she argues that Ripley acted within the scope of his

---

[2] It is unclear from the Complaint on which theory of vicarious liability Smith intends to rely, as she alleges only that "[t]he State is vicariously liable for the actions of Mr. Ripley, who was acting in his official capacity as a Child Protection Specialist at the time the conduct complained of herein occurred." (Doc. 3 at 11–13.) Nevertheless, and as already set out, the Complaint need

employment, such that the respondeat superior doctrine applies. Alternatively, even if Ripley acted outside the scope of employment, Smith contends that the State owed her a nondelegable duty of care.

For the following reasons, the Court agrees with the State that Ripley acted outside the scope of employment—thereby foreclosing Smith's respondeat superior argument. However, the Court finds Smith's position that the State owed her a nondelegable duty persuasive. The Court will address each theory in turn.

### A. Respondeat Superior in Montana

Under Montana's respondeat superior doctrine, "a master is liable for the torts of his servant . . . [and] [w]illful and malicious acts of the servant are imputable to the master under the same rule." *Kornec v. Mike Horse Mining & Milling Co.*, 180 P.2d 252, 256 (Mont. 1947). An employer's liability for the torts of his employee is not unqualified, however, as it applies only "to an employee or agent who is acting within the scope of his duties owed to his employer or principal." *Gentry v. Douglas Hereford Ranch, Inc.*, 962 P.2d 1205, 1211 (Mont. 1998). Whether an employee acts within the scope of employment is generally a question of fact; "[i]t becomes one of law, however, when it appears that the given

---

not "pin [Smith's] claim for relief to a precise legal theory" to survive the State's Rule 12(b)(6) motion to dismiss. *Skinner*, 562 U.S. at 529–30 (internal citations and quotation marks omitted).

deviation was made for the purpose of doing something which had no connection with the servant's duty." *Hoffman v. Roel*, 203 P. 349, 350 (Mont. 1921).

An employee's conduct falls within the scope of employment for respondeat superior purposes if he acts "in the course of his employment, in furtherance of his employer's interest, or for the benefit of his master, . . . etc." *Kornec*, 180 P.2d at 256 (internal quotation marks and citation omitted). On the other hand, "a servant who acts entirely for his own benefit is generally held to be outside the scope of his employment and the master is relieved of liability." *Id.*

Rape is outside the scope of employment, even if it occurrs in the workplace and under conditions conducive to predatory conduct. *Maguire v. State*, 835 P.2d 755, 758 (Mont. 1992). In *Maguire*, an employee of the Montana Developmental Center raped the mentally disabled patient to whom his employer—a state institution—had assigned him primary caretaking responsibilities, which included bathing and dressing her. *Id.* After reciting the bounds of employers' liability under the respondeat superior doctrine, the Montana Supreme Court concluded in one sentence that "[i]t is clear this rape was outside the scope of [the employee's] employment." *Id.*

Smith does not dispute that *Maguire* stands for the general rule that, in Montana, rape falls outside the scope of employment. (*See* Docs. 5 at 6; 8 at 11.) Instead, she relies on *Kornec* to argue that Ripley's "conduct was incidental to and

so connected with the task he was performing for the State" that the Court should treat it as "one indivisible tort" within the scope of employment. (Doc. 8 at 11.) Essentially, Smith posits that, but for Ripley's employment with the State, he never would have been in her home and in a position to rape her. (*Id.*) However, she improperly conflates the "but-for" test for causation, *see Busta v. Columbus Hospital Corp.*, 916 P.2d 122, 140 (Mont. 1996), with Montana's respondeat superior analysis—jurisprudence developed under the umbrella of agency law. *Maguire*, 835 P.2d at 758. And, in any event, *Kornec* is both consistent with the principles set out in *Maguire* and readily distinguishable from the facts here.

There, a landowner sued a mining company after its employee assaulted him. *Kornec*, 180 P.2d at 254. Because it did not order the assault, the company argued that respondeat superior liability could not lie against it. *Id.* at 257. The *Kornec* Court rejected the company's overly simple reading of the doctrine, and instead asked whether the assault "arose out of and was committed in prosecution of the task the servant was performing for the master." *Id.* Contrary to Smith's argument, the *Kornec* inquiry is *not* driven by a but-for causation analysis, but instead examines the foreseeability of the conduct and whether it arose to advance the employer's—not the employee's—interests.

So, based on the landowner's well-known and longstanding disapproval of the company's construction of a dam downstream from his property, the Court

found that the company could have reasonably "apprehended that [its employee] might become involved in an altercation with the [landowner]" when it sent him to repair the dam. *Id.* at 257. Furthermore, nothing in the record suggested that the employee harbored any personal animus against the landowner. *Id.* Although the company did not instruct its employee to attack the landowner, the assault was nevertheless "so connected with and immediately [grew] out of" his repair of the company's controversial dam. *Id.* at 256–57. Therefore, the assault "was within the scope of the [employee's] employment and done while engaged in his masters' business and 'in furtherance of that business and the masters' interest.'" *Id.*

The Complaint here fails to allege any analogous facts to show that the rape was so connected to conduct within the scope of Ripley's employment that, despite *Maguire*, the Court should impute liability to the State under the respondeat superior doctrine. Unlike in *Kornec*, where a credible argument could be made that the employee's assault protected the company's interest in its dam, Smith cannot and does not argue that her rape furthered the State's business or advanced its interests. Therefore, although Ripley may have been on the clock for the State when he raped Smith, the rape did not arise out of the prosecution of his task to collect paperwork from her.

Because the deviation here—rape—was made for the purpose of doing something which had no connection with Ripley's job, the Court finds that Ripley

acted outside the scope of his employment. Therefore, the Court agrees with the State that the respondeat superior doctrine is inapplicable.

B.     **The Nondelegable Duty Exception to Respondeat Superior**

"[A] nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs." *Meyer v. Holley*, 537 U.S. 280, 290 (2003) (citation omitted) (alteration in original). As such, a nondelegable duty "go[es] further" than other vicarious liability principles—like respondeat superior—by creating liability "although [the principal] has himself done everything that could reasonably be required of him . . . and irrespective of whether the agent was acting with or without authority." *Id.* (internal citation omitted) (alteration in original). Where a nondelegable duty exists, an employer may be held liable for its employee's tortious acts *outside* the scope of employment; therefore, Montana treats the nondelegable duty doctrine as an exception to respondeat superior. *Maguire*, 835 P.2d at 758–59.

After initially declining to do so in *Maguire*, the Montana Supreme Court adopted the "exception to the general rule of respondeat superior" under Restatement (Second) of Agency § 214. *Maguire*, 835 P.2d at 758, 760; *Paull v. Park Cty.*, 218 P.3d 1198, 1205 (Mont. 2009). Section 214 provides for the "Failure of the Principal to Perform a Non-delegable Duty":

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance or such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

Restatement (Second) of Agency, § 214 (Am. Law Inst. 1958). The drafters of § 214 explain that, under the nondelegable duty exception, an employer who "enter[s] into certain relations with others . . . may become responsible for harm caused to them by conduct of its agents or servants *not* within the scope of employment." *Id.* at cmt. a (emphasis added). In other words,

> A master or principal may be in such relation to another that [it] has a duty to protect, or to see that due care is used to protect, such other from harm although not caused by an enterprise which has been initiated by the master or by things owned or possessed by him.

*Id.* at cmt. e. Under this Section, a nondelegable duty of care may be created by statute. *Id.*

The *Paull* Court applied § 214 to find that the state owed a nondelegable duty to provide safe interstate transport to probationers. 218 P.3d at 1205. As such, it held the state liable for a probationer's injuries when he was transported to Montana by a private company—approved and paid for by the state—whose staff purposely drove in a dangerous and erratic manner that ultimately resulted in a catastrophic wreck. *Id.* at 1203, 1205. Because it had "no direct contact" with the transport company, the state argued against liability based on agency principles.

-11-

*Id.* at 1204. However, the state's emphasis on its connection to the company—its agent[3]—was misplaced. Instead, under § 214, the inquiry focuses not on the scope or nature of the principal's relationship to its *agent*, but rather the "relation to *another* that [the principal] has a duty to protect." Restatement (Second) of Agency, § 214 cmt. e (emphasis added).

So, focusing first on Montana statutory law and then on the nature of their relationship, the *Paull* Court determined that the state owes probationers a nondelegable duty of ordinary care when it transports them. 218 P.3d at 1205. The language of Montana's Interstate Compact for Adult Offender Supervision ("the Compact") supplied, in part, the source of the state's duties to probationers:

> The states entering into this compact recognize that they are responsible for the supervision of offenders who are authorized pursuant to this compact to travel across state lines to and from the compacting states, and that the compacting states are responsible for tracking the location of offenders, transferring supervision authority it an orderly and efficient manner, and when necessary, returning an offender to the originating jurisdiction.

Mont. Code Ann. § 46–23–115, art. I (1). Additionally, the Court noted that the Compact endeavored to "protect rights of victims through control and regulation of

---

[3] The *Paull* Court quickly disposed of the state's argument that, because a county sheriff's office made direct contact with the transport company, no agency relationship existed between the state and the company: "[w]ithout some actual or apparent authority derived from the [s]tate [the company] had no basis for shackling [the probationer], confining him, and transporting him across the country." 218 P.3d at 1204.

-12-

interstate movement of offenders, to provide for the supervision of offenders in member states." 218 P.3d at 1204 (citing Mont. Code Ann. § 46–23–1115, art. I (2)). Based on these statutory provisions, the *Paull* Court determined that the Compact, "which is a part of Montana law, recognizes the [s]tate's responsibility for probationers, and for returning offenders when necessary." *Id.* at 1204.

The Court then explained that when probationers are supervised and revoked pursuant to the Compact, they are "in a continuing relationship with the [s]tate of Montana." 218 P.3d at 475. For example, "[p]robation is a status of conditional liberty depending upon adherence to the state's special restrictions and conditions." *Id.* (citation omitted). When probation is revoked, it is "the [s]tate that want[s] [probationers] returned to Montana to answer its process." *Id.* at 475–76. Probationers are "under [s]tate authority and supervision." *Id.* at 476. Under the Compact, it is "the [s]tate that cause[s] [probationers] to be arrested . . . and to be held 'for Montana.'" *Id.*

Therefore, after explicitly adopting § 214 without limitation,[4] *Paull* held that the state could be vicariously liable for the tortious acts of its agents even if they

---

[4] This Court previously rejected the argument that Montana only adopted § 214 "in relation to inherently dangerous activities." *Shepherd v. Nt'l R.R. Passenger Corp.*, No. CV-17-40-GF-BMM-JTJ, 2018 WL 5309825, at *4 (D. Mont. Apr. 9, 2018). As the Court stated, "the *Paull* Court did not impose any such limitation on its application." *Id.*; *see also Shepherd v. Nt'l R.R. Passenger Corp.*, No. CV-17-40-GF-BMM-JTJ, Or. Adopting Findings and Recommendations (D. Mont. Aug. 15, 2018). Furthermore, nothing in *Paull* suggests that the Court treated the private transport company as a "common carrier" such that its analysis would fall more neatly

were acting outside the scope of employment by intentionally driving dangerously. *Id.* at 1203, 1205. "[I]f the [s]tate chooses to transport prisoners by allowing other entities to do the work, it may be held liable for the tortious acts or omissions of its agents undertaking the transportation." *Id.* at 1205.

Applying the *Paull* framework to the facts presented here leads the Court to a similar result. First, the State cannot and does not argue that no agency relationship existed between it and Ripley when he went to Smith's home in his capacity as a Child Protection Specialist. (Doc. 3 at 6.) On the facts alleged, without some actual or apparent authority derived from the State, Ripley had no basis for entering Smith's property and collecting materials from her on the morning of September 25, 2017. (*Id.*) *See also Stricker v. Blaine Cty.*, 452 P.3d 897, 902 (Mont. 2019) (stating that an agency relationship requires both consent and control).

Next, as in *Paull*, Montana statutory law provides the source of the State's responsibilities to families when it intervenes and removes children from their parents:

> The [State] *shall make reasonable efforts* to prevent the necessity of removal of a child from the child's home and *to reunify families that have been separated by the [S]tate.* Reasonable efforts include but are

---

into the traditional approach to the nondelegable duty exception. *See also* Bryan A. Garner, *Black's Law Dictionary* (11th ed. 2019) (defining a "private carrier" as "not bound to accept business from the general public").

> not limited to voluntary protective services agreements, development of individual written case plans specifying state efforts to reunify families, placement in the least disruptive setting possible, provision of services pursuant to a case plan, and periodic review of each case to ensure timely progress toward reunification or permanent placement.

Mont. Code. Ann. § 41–3–423(1) (2019) (emphasis added). The relevant Chapter of the Montana Code seeks to "provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for the children's care and protection." *Id.* at § 41–3–101(a). Additionally, the Legislature sought to "achieve these purposes in a family environment and preserve the unity and *welfare of the family* whenever possible." *Id.* at § 41–3–101(b) (emphasis added).

Where the Compact set out the State's responsibility for the welfare of its probationers passively (i.e., the State is responsible "for the supervision of offenders" and "for tracking . . . transferring . . . and returning an offender"), the statutory law here affirmatively obligates the State to exercise reasonable efforts to reunify families, like Smith's, after the State has separated them. The purpose of the law is to protect children from threatening conduct by those who are responsible for their safety and welfare and to preserve the welfare of the "family" where possible—not just the children. The Child Abuse and Neglect Chapter, along with the specific statute here, clearly recognizes the State's responsibility for the children and families that it sweeps into its jurisdiction through abuse and

neglect proceedings. The Montana Supreme Court has read the law in the same way: "when the State intervenes and removes a child from one parent, it assumes a good-faith *duty* to provide reasonable efforts to reunite the child with the other"; and "when the State moves to intervene in a family for the protection of the child, the [S]tate must provide the parents with fundamentally fair procedures." *Matter of B.H.*, 456 P.3d 233, 244–45 (Mont. 2020) (internal quotation marks and citations omitted) (emphasis added). The State cannot reasonably argue that any of these statutory duties to families are fulfilled when its Child Protection Specialist rapes a case client while on State business.

Finally, analogous to the probationer in *Paull*, Smith was in a continuing relationship with the State after it removed her children from her home and legal custody. Smith was working to complete a State-imposed treatment plan, which involved psychological evaluations of both her and her children, when Ripley arrived at her home to collect executed paperwork related to the plan. (Doc. 3 at 6.) And, similar to the liberty interests implicated when an offender is under probation, "a natural parent's right to the care and custody of his or her children is a fundamental constitutional interest protected by both the United States Constitution and the Montana Constitution." *Matter of B.H.*, 456 P.3d at 244. Further, like probation, a parent's freedom from the restrictions of State intervention is conditioned on her adherence to the State's special conditions, i.e.,

psychological evaluations pursuant to a treatment plan. The State's relationship with Smith—on the facts alleged—was significant and ongoing.

Therefore, applying § 214, and considering the Court's analysis in *Paull*, the State had a nondelegable duty of reasonable care to Smith. By way of statute and the ongoing nature of the relationship the flowed therefrom,[5] the State was under a duty to exercise reasonable care in protecting Smith's children and her family when it intervened in her case. When the State delegated performance of that duty to Ripley by assigning him to Smith's case, it became subject to liability to Smith from the harm he caused by failing to perform the State's duty. Accordingly, the Court agrees with Smith that the nondelegable duty exception applies to impute liability to the State for Ripley's alleged torts, even though they occurred outside the scope of employment.

---

[5] The Court emphasizes that it conducted a two-part analysis, based on its reading of *Paull*, to find a nondelegable duty on the facts of this case. First, the Court found that Montana statutory law recognizes the State's responsibility for the children and families under its abuse and neglect jurisdiction. Second—and importantly—the Court determined that when the State injects itself into families under the applicable chapter and statute, its relationship with families is "significant" and "continuing." *Cf. Paull*, 218 P.3d at 1205 (describing the significant and continuing relationship between the State and probationers). The relationship between the State and families implicates fundamental liberty interests that are dependent upon the State's special conditions and restrictions. In other words, the Court cautions future litigants that this Order does not stand for the proposition that, if a governing or relevant statute exists, a nondelegable duty automatically follows under § 214.

## IV. Immunity

As a final matter, the Court will briefly address and reject the State's immunity argument. The delegates to the 1972 Montana Constitutional Convention "intended to provide redress for all persons, whether victims of governmental or private torts." *Noll v. City of Bozeman*, 534 P.2d 880, 882 (Mont. 1975) (citation omitted). Accordingly, Montana's Constitution provides that "[t]he state . . . shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law." Mont. Const. art. II, § 18 (1972).

Attempting to avoid the Constitution's sweeping waiver of sovereign immunity, the State points to an inapposite statute directed at the "[i]mmunization, defense, and indemnification of [state] employees." (Doc. 5 at 7 (citing Mont. Code Ann. § 2–9–305 (2019).) Nothing in the State's proposed source of immunity relates to the *State's* immunity, but instead sets out its indemnification obligations as they relate to State *employees*. Additionally, just as the Court found in *Paull*, where the nondelegable duty exception to respondeat superior's scope-of-employment requirement exists, the State may be held liable for the tortious acts or omissions of its agent. 218 P.3d at 1205; *see also Maguire*, 835 P.2d at 758 (describing § 214 as "an employer's vicarious liability for the tortious acts of its employees acting outside the scope of employment").

-18-

Accordingly, the Court finds that, if the State chooses to carry out its duties under Montana's Child Abuse and Neglect laws, *supra*, by allowing agents like Ripley to do the work, it lacks immunity from vicarious liability under the nondelegable duty rule.

## ORDER

For the foregoing reasons, IT IS ORDERED that the State's motion (Doc. 4) is DENIED.

Dated this 12th day of March, 2020.

*Dana L. Christensen*
Dana L. Christensen, Chief Judge
United States District Court